| | |
|---|---|
| DISTRICT COURT, COUNTY OF LARIMER, COLORADO <br> Court Address: 201 LaPorte Avenue, Suite 100 <br> Ft. Collins, Colorado 80521 <br> (970) 494-3500 | DATE FILED: July 21, 2020 12:32 PM <br> FILING ID: 2598B23C98817 <br> CASE NUMBER: 2020CV30484 |
| **Plaintiff:** PLATTE RIVER POWER AUTHORITY, a Colorado not-for-profit utility, <br><br> v. <br><br> **Defendant:** GALLAGHER BENEFIT SERVICES, INC, a Delaware corporation; LYNN BROWNLEE, an individual; SHAWN ADKINS, an individual; and LISA RAMIREZ, an individual. | ▲COURT USE ONLY▲ |
| *Attorneys for Plaintiff Platte River Power Authority:* <br><br> John H. Bernstein, #17358 <br> Reid A. Page, #37722 <br> Elizabeth J. Field, #52696 <br> KUTAK ROCK LLP <br> 1801 California Street, Suite 3000 <br> Denver, CO  80202 <br> Telephone:  303-297-2400 <br> Facsimile: 303-292-7799 <br> Email:   john.bernstein@kutakrock.com <br>          reid.page@kutakrock.com <br>          elizabeth.field@kutakrock.com | Case No.: <br><br> Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Platte River Power Authority ("**Platte River**"), by and through its undersigned counsel, for its Complaint and Jury Demand against Defendants Gallagher Benefit Services, Inc. ("**Gallagher**"), Lynn Brownlee ("**Brownlee**"), Shawn Adkins ("**Adkins**"), and Lisa Ramirez ("**Ramirez**," and collectively with Gallagher, Brownlee, and Adkins, "**Defendants**") states and alleges as follows:

## INTRODUCTION

This action arises out Defendants' failure to competently advise Platte River and procure an insurance policy that adequately protected Platte River against high-cost claims.  Platte River is a publicly owned utility that hired Gallagher based on Gallagher's purported expertise in group health insurance policies to procure a group health insurance policy that Platte River could provide to its employees.  Pursuant to a consulting agreement dated January 1, 2013 between Platte River

1

and Gallagher, Gallagher agreed to, among other things, continually review Platte River's ongoing needs and objectives for its benefit plans and advise on and procure insurance policies—including health insurance policies—that fit those needs.  Platte River reasonably relied on Defendants to advise and warn it regarding potential risk and benefits to various policy structures and possible claims.  However, before 2017, Defendants failed to warn and advise Platte River regarding the impact of an individual high-cost, long-term claimant.  In 2017, a Platte River employee's child was born with significant, long-term medical issues, resulting in the child's family submitting major claims against Platte River's insurance plan in 2017, 2018, and 2019.

As a direct result of Defendants' failure to advise Platte River regarding the possibility of and risk related to an individual high-cost, long-term claim *before* the birth of the employee's child, Platte River was unable to obtain favorable insurance policies at renewal for years 2018 and 2019, and Platte River was consequently forced to pay avoidable amounts of up to $1,000,000 in 2018 and up to $2,000,000 in 2019.  After having been forced to accept unsatisfactory renewal policies for two years in a row, Platte River began discussions in 2019 with other insurance brokers that could replace Gallagher and better protect Platte River's interests going forward.  Through these discussions, Platte River discovered that, in the pre-2017 timeframe (before the birth of the employee's child) there were insurance structures and policy terms that were common and standard in the industry for employers such as Platte River and that would have greatly reduced Platte River's exposure and damages resulting from the high-cost claimant.  Gallagher failed to warn or advise Platte River regarding these protections and failed to procure policies which provided these protections to Platte River.  As a result, Platte River brings this action to recover its avoidable damages caused by Defendants' misconduct.

## PARTIES

1. Plaintiff Platte River is a Colorado not-for-profit utility with its principal place of business at 2000 E. Horsetooth Rd., Fort Collins, Colorado 80525.

2. Defendant Gallagher is a Delaware corporation with its principal place of business at 2850 Golf Road, Rolling Meadows, Illinois 60008.

3. Defendant Lynn Brownlee is an individual who, upon information and belief, resides in or near Denver, Colorado.

4. Defendant Shawn Adkins is an individual who, upon information and belief, resides in or near Denver, Colorado.

5. Defendant Lisa Ramirez is an individual who, upon information and belief, resides in or near Denver, Colorado.

## JURISDICTION AND VENUE

6. Jurisdiction is proper in this Court under Colorado Revised Statute § 13-1-124 because Defendants have (i) transacted business within Colorado, (ii) committed tortious acts

within Colorado, and (iii) contracted to insure a person, property, or risk residing or located within Colorado.

7. Venue is proper in this Court under C.R.C.P. 98(c) because the agreement that is the subject of this action contains a venue provision specifying that any proceeding arising out of the agreement shall be brought in this Court: "This Agreement shall be governed by the laws of the State of Colorado, and venue shall be in the County of Larimer, State of Colorado." Further, the agreement was a contract for services that were to be performed in Larimer County and the tortious acts were committed in Larimer County.

## GENERAL ALLEGATIONS

8. Platte River is a not-for-profit utility that generates and delivers safe, reliable, environmentally responsible and financially sustainable energy and services to its owner communities of Estes Park, Fort Collins, Longmont, and Loveland.

9. Platte River currently has approximately 260 employees and is required to provide health insurance for its employees.

**A.     Insurance Policies Generally Available to Employers such as Platte River**

10. There are various types of plans that employers such as Platte River can procure to provide group health insurance for their employees, including fully insured plans and self-insured plans.

11. A fully insured plan is a structure where, generally, an employer pays an insurance carrier a certain agreed-upon amount called a premium each year[1] and the insurance carrier pays the health care costs of the company's employees and their dependents during that year in accordance with their coverage policy. In this type of plan, the insurance company carries the risk that an employee or dependent will need significant medical care, and, in exchange, the employer pays generally higher premiums.

12. A self-insured plan, on the other hand, is generally where an employer, itself, agrees to pay the health care costs of its employees and their dependents. In this structure, the employer does not pay any premiums to an insurance carrier, but the employer carries the risk that an employee or dependent will have large health care needs.

13. To limit the risk of expensive health care costs, an employer that is self-insured often procures insurance coverage for claims that exceed a certain agreed-upon amount. This type of additional insurance coverage is called a stop loss insurance plan.

14. Stop loss insurance plans can be structured in various ways. One type of stop loss coverage, called specific stop loss, protects against large costs incurred by any single individual. For example, a self-insured company could agree to cover all costs for each individual up to

---

[1] Premiums can also be paid in part by a company's employees. For the sake of simplicity, this analysis omits that aspect of insurance coverage.

3

4812-7896-8511.6

$100,000 and then rely on a specific stop loss insurance plan to cover any amounts above $100,000.  In this example, if a single employee incurred medical costs in the amount of $120,000 in a given year, the company would pay $100,000 and the insurance carrier would pay $20,000.

15. Stop loss insurance plans can also be structured to protect against the combined costs of all individuals in the group plan.  This type of stop loss coverage is called an aggregate stop loss plan.  In an aggregate stop loss plan, a self-insured company agrees to pay a certain total amount for health care costs across its entire plan.  Then, if the total combined medical costs of all individuals in the group plan exceed that amount, the insurance company will pay the costs above that threshold.

16. Insurance companies that offer stop loss policies also use something called a laser.  A laser is the practice of applying a higher specific deductible to an individual with a known condition.  For example—where a self-insured company agrees to cover all costs for each individual up to $100,000 and relies on an insurance company to cover all amounts over $100,000—if an employee of the company is diagnosed with cancer, the insurance company could apply a laser of, say, $500,000 to that employee at renewal.  This means that, in the following year, if the cancer patient incurs $650,000 in medical costs, the company will pay $500,000 toward those costs and the insurance company will pay the remaining $150,000.  For the remaining non-lasered employees, the insurance company will still pay any amounts incurred over the original company deductible of $100,000.

17. Insurance companies justify applying lasers to high-cost individuals by claiming that, without lasers, the employer's deductible for each individual and employee premiums would significantly increase to account for the high-cost individual.

18. Self-insured companies can protect against lasers by adding certain provisions to their stop-loss policies before a medical event occurs or worsens.  These types of protective provisions may include the following:  (i) the insurance company agreeing to not add any new lasers at renewal; (ii) the insurance company agreeing to a rate cap at renewal, which, for example, prevents an insurance company from increasing its rates by more than, say, forty percent at renewal; and (iii) the insurance company agreeing to a so-called laser lock, where the insurance company is allowed to apply a laser to a high-cost individual, but the insurance company agrees not to increase the amount of the laser at the subsequent renewal.

19. Due to the complexity of procuring appropriate insurance coverage and based on Gallagher's purported expertise in advising employers on such topics, in 2013, Platte River entered into an Employee Benefits Consulting Services Agreement with Gallagher, Contract Number HQ12-1685, dated January 1, 2013 (the "**Consulting Agreement**"), whereby Platte River hired Gallagher to procure and maintain insurance policies—including health insurance—to protect Platte River against hazards and risk of loss.  A copy of the Consulting Agreement, excluding certain endorsements, amendments, coverage acknowledgement and privacy policy disclosure, is attached hereto as **Exhibit A**.

### B. Gallagher's Obligation to Procure Health Insurance Coverage for Platte River's Custom Needs and Objectives

20. In the Consulting Agreement, Gallagher agreed to advise Platte River, beginning January 1, 2013, "in developing strategies to provide comprehensive employee benefits at reasonable costs," which "includes continual review of the organizational needs and objectives for the benefit plan design, assisting in plan management, plan budgeting, plan implementation, research and technical services, renewals and marketing, and assistance with plan compliance." Consulting Agreement, Exhibit A, Scope of Services, Section 5.

21. Specifically, with regard to Platte River's self-funded medical health plans, Gallagher agreed to "[a]dvise on current plan design and recommend plan changes appropriate to Platte River Power Authority"; "[p]rovide general guidance on trends in benefits and eligibility requirements regionally and nationally"; "[r]ecommend plan changes based on these trends"; "[a]dvise and consult on methods for improving cost containment and claims administration"; and, "[w]here applicable, provide cost analysis of possible impact on plan." Consulting Agreement, Exhibit A, Scope of Services, Section 5.1.

22. Gallagher warranted and represented that it "has the requisite authority, capacity, experience, and expertise to perform the Services in compliance with the provisions of this Agreement and all applicable laws and agrees to perform the Services on the terms and conditions set forth herein." Consulting Agreement, Section 1.

23. In consideration for its services under the Consulting Agreement, Platte River paid Gallagher $52,000 in 2013; $52,000 in 2014; $52,000 in 2015; $57,000 in 2016; $58,800 in 2017; $60,500 in 2018; and $62,300 in 2019. Further, in 2015, Gallagher charged Platte River an additional $7,500 to perform services—such as soliciting bids from 8 to 10 prominent stop loss carriers, determining the cost effectiveness of the bids, and reviewing the potential cost savings available to Platte River based on those bids—that it had already agreed to perform under the Consulting Agreement.

24. From 2013 until 2016, pursuant to its obligations to Platte River, Gallagher agreed to advise Platte River with respect to self-insured plans, with stop loss coverage provided through an insurance carrier.

25. Further, Gallagher was aware between 2013 and 2016 of the possibilities that lasers could be applied to high cost individuals. However, at no time before 2017 did Gallagher warn or advise Platte River with respect to the adverse consequences of an individual large and continuing claim, potential lasers on such a claim, and the impacts that such a claim and/or lasers would have on Platte River's future insurability.

5

### C. Defendants' Failure to Warn and Advise in the Fall of 2016 and Failure to Procure a 2017 Stop Loss Insurance Plan That Adequately Protected Against Potential Large Claims

26. Despite agreeing, among other things, to continually review Platte River's organizational needs and objectives for the benefit plan design, Defendants failed to adequately protect Platte River from the possibility of a large individual claim before implementing the 2017 Stop Loss Plan, as defined below, (the "**Pre-2017 Time**").

27. In the Pre-2017 Time, Defendants failed to advise Platte River about the possibility of lasers on continuing, large claims; alternatives to lasers for such a claim; or other available products that would mitigate significant loss resulting from a large claim, despite agreeing, among other things, to advise and consult on methods for improving cost containment and claims administration.

28. In the Pre-2017 Time, Defendants failed to discuss with Platte River the financial impact of a laser on a continuing, large claim and the long-term effects of a large claim on Platte River's ability to renew and procure stop loss insurance, despite agreeing, among other things, to provide cost analyses of possible claim impacts on plans.

29. In the Pre-2017 Time—and throughout the entirety of Gallagher's relationship with Platte River— Defendants failed to discuss with Platte River how a large, multi-year claim could be potentially catastrophic to a self-insured company like Platte River, yet Gallagher had agreed, among other things, to advise on current plan design and recommend plan changes appropriate to Platte River.

30. In the Pre-2017 Time, Defendants failed to provide alternative policies to Platte River that would have protected Platte River against the large claim and resulting lasers, including failing to provide policies with provisions such as for (i) no new laser at renewal, (ii) renewal rate cap, (iii) laser lock, and (iv) aggregate stop loss coverage, which were available and customary for firms providing services similar to those Gallagher provided to clients such as Platte River. This is a glaring failure of Gallagher's obligation to advise Platte River on trends in benefits and eligibility requirements regionally and nationally.

31. As a result of Defendants' failures in the Pre-2017 Time, Platte River (i) was not adequately protected against the Employee's, as defined below, large individual claim; (ii) was unable to avoid the application of a laser to the Employee after the Employee's child was born with significant health issues; (iii) incurred avoidable costs in 2017 and the following years; and (iv) had extremely limited and expensive options for procuring stop loss policies in 2018 and 2019.

### D. The Inadequate 2017 Stop Loss Plan

32. In the fall of 2016, Gallagher, through Ramirez who, upon information and belief, was a Client Consultant at Gallagher and Adkins who, upon information and belief, was a Senior Employee Benefits Consultant, procured for the benefit of Platte River a stop loss insurance plan

6

through Aetna Life Insurance Company ("**Aetna**") effective January 1, 2017 (the "**2017 Stop Loss Plan**").

33. The 2017 Stop Loss Plan provided that Platte River would pay claims up to the amount of $175,000 for each individual claimant (the self-insured deductible) and that Aetna would pay any amounts over $175,000 for that claimant.

34. The 2017 Stop Loss Plan did not include a renewal rate cap, a laser lock provision, any aggregate stop loss coverage amounts, or a provision prohibiting new lasers at renewal.

35. Gallagher, Ramirez, and Adkins advised and recommended that Platte River agree to the 2017 Stop Loss Plan.

36. Relying on Gallagher, Ramirez, and Adkins' advice and recommendation, Platte River agreed to the 2017 Stop Loss Plan.

**E.    Platte River's Large Claim**

37. In February 2017, a Platte River employee's (the "**Employee**") child was born with significant, long-term medical issues that required substantial medical attention.

38. The Employee's claim quickly exceeded $175,000, the amount of Platte River's self-insured deductible.

39. As 2017 progressed and the Employee's claim continued to grow with no end in sight, Gallagher acknowledged to Platte River that the Employee's claim could cause difficulties for renewal in 2018.

40. Later in the year, Gallagher, through Ramirez (who was a Client Consultant at Gallagher), advised Platte River that Gallagher might not be able to procure a quote for a 2018 stop-loss insurance policy due to the Employee's large claim.

41. In total, the Employee's claimed amount for the year 2017 was $1,555,734, of which Platte River paid $175,000.

**F.    Defendants' Last-Minute and Inadequate Procurement of the 2018 Stop Loss Insurance Plan**

42. Under the Consulting Agreement, Gallagher agreed that "time is of the essence," and agreed to provide the following services in a timely manner:

> **5.2 Administrative/Other Support:** Assist in developing long-term benefit objectives and goals. Assist in the modification and pricing of any current, or newly considered, benefit programs. Work collaboratively to revise … the plan documents, including amendments and restatements.… Advise and consult on trends in benefit plans that are offered locally and nationally, including information on plans that are not currently offered.…

7

> Assist with the management of problem claims or appeals. Render opinions and/or guidance on such claims and/or appeals. Review unusual claims situations, such as appeals or subrogation which require special handling. Consulting Agreement, Exhibit A, Scope of Services, Section 5.2.
>
> **5.3 Renewal and Contract Negotiations:** Conduct an annual review and negotiation of renewal rates for long term disability, life insurance, employee assistance, stop loss insurance, and other plans. Advise when competitive quotes should be solicited from other carriers. Consulting Agreement, Exhibit A, Scope of Services, Section 5.3.

43. Despite Gallagher's knowledge of the Employee's large claim in 2017, it failed to provide timely advice or recommendations to Platte River regarding procuring a stop loss plan for 2018.

44. Despite Gallagher's knowledge that the large claim was likely to continue for many years, Gallagher failed to discuss or secure additional protections for Platte River, including a laser lock provision that would have guaranteed the insurer could not subsequently raise whatever laser was applied to the Employee at the first renewal after the Employee's child was born.

45. Upon information and belief, Gallagher failed to take necessary actions in the key period from when it first knew of the large claim in early 2017 through the fall of 2017 to adequately research and procure a policy for the upcoming year of 2018 that would adequately protect Platte River against avoidable financial loss, including by failing to negotiate a laser lock provision.

46. In fact, Gallagher failed to provide *any* written proposals to Platte River for a 2018 stop loss plan until December 19, 2017, and just a few days later, on December 22, 2017, Gallagher acknowledged that Platte River had only one insurance policy option for the following year.

47. On December 19, 2017, Gallagher, through Ramirez, emailed Platte River a finalized proposal from Aetna for a Stop Loss Insurance Plan effective January 1, 2018 (the "**2018 Stop Loss Plan**").

48. The 2018 Stop Loss Plan included a one-million-dollar laser applied to the Employee (the "**2018 Laser**").

49. The 2018 Laser meant that Platte River would now be responsible for paying up to $1 million—rather than the previous deductible of $175,000—for the Employee's claims in 2018, and that Aetna would pay only amounts for the Employee's claims that exceeded $1 million.

50. In the same email on December 19, 2017, Gallagher, through Ramirez, advised Platte River that "[w]e are still waiting to hear back from one or two more carriers, however the news has not been good and all others have reviewed the data and either declined to quote or would have needed a far more significant increase than what Aetna has offered."

8

51. A few days later, on December 22, 2017, Gallagher, through Ramirez, advised Platte River that "given the lack of competitive quotes on stop loss, we'll need to proceed with Aetna's proposal," which was the 2018 Stop Loss Plan containing the 2018 Laser of $1 million.

52. Gallagher, through Ramirez, also advised Platte River in the email sent on December 22, 2017 that Platte River would need to sign and return the 2018 Stop Loss Plan before December 31, 2017.

53. Gallagher's delay in providing its stop loss policy recommendation to Platte River in December 2017 caused Platte River to have only four full business days—over the holidays—to confer and decide how to proceed regarding its health insurance coverage for 2018.

54. Ultimately, faced with no other feasible options, Platte River reluctantly agreed to the 2018 Stop Loss Plan through Aetna that included the 2018 Laser of $1 million for the Employee's claims.

### G. Gallagher's Failure to Advise in 2018 and Failure to Adequately Procure a 2019 Stop Loss Insurance Plan

55. Throughout 2018, the Employee's claim continued to rapidly increase. By March 2018, the Employee's claim was approximately $1,700,000.

56. In light of the large claim and after the rushed and disappointing renewal effort in December 2017, Platte River reasonably expected that Gallagher would proactively propose alternative policies and solutions throughout 2018 that would better protect Platte River in the following year, 2019.

57. According to the Consulting Agreement, Gallagher had agreed to assist Platte River "in developing strategies to provide comprehensive employee benefits at reasonable costs," which "includes <u>continual</u> review of the organizational needs and objectives for the benefit plan design, … <u>plan budgeting</u>, … [and] <u>renewals and marketing</u>." Consulting Agreement, Exhibit A, Scope of Services, Section 5 (emphasis added).

58. However, by mid-year 2018, Gallagher had still not provided meaningful guidance or suggestions for how Platte River should accommodate, plan, or otherwise deal with the large claim. Nor had Gallagher provided any guidance or suggestions for how Platte River should prepare to deal with large claims that might occur in the future.

59. By early July 2018, Platte River affirmatively reached out to Gallagher and requested a renewal proposal for 2019.

60. Based on the information Gallagher then provided, Platte River prepared its own mid-year summary of health insurance in preparation for acquiring a more favorable policy in 2019.

61. Platte River continued to reasonably expect high communication and guidance from Gallagher as it planned for 2019, but Gallagher's responses were lacking.

62. Based on Gallagher's failure to provide its services to Platte River at the standard to which it had agreed, Platte River began discussions about replacing Gallagher with another insurance agency in the fall of 2018.

63. Platte River's interest in replacing Gallagher was then strengthened when, after having a full year to research the market, obtain quotes, and provide recommendations to Platte River for its 2019 coverage, Gallagher, Brownlee, and Ramirez did not provide a full market analysis and quotes to Platte River until very late in the year—December 20, 2018.

64. Gallagher's—through Brownlee and Ramirez—delayed production of the information that Platte River needed in order to decide on an insurance plan for the following year was avoidable and forced Platte River to again confer and decide, in a matter of days during the holidays, how to proceed regarding its health insurance coverage.

65. Further, Gallagher—through Brownlee and Ramirez—was able to procure quotes from only two insurers, Aetna and Anthem Life Insurance Company ("**Anthem**"), and each quote either declined coverage of the Employee or included a high laser for the Employee.

66. Platte River ultimately chose and agreed to the Stop Loss Policy through Anthem effective January 1, 2019 (the "**2019 Stop Loss Plan**").

67. The 2019 Stop Loss Plan included a two-million-dollar laser applied to the Employee (the "**2019 Laser**"), which meant that Platte River would pay up to $2 million for the Employee's claims in 2019.

68. Gallagher's failure to provide adequate protections in the Pre-2017 Time, and subsequently to secure a laser lock, among other protections, in 2017 when it was researching and procuring the 2018 Stop Loss Plan directly exposed Platte River to liability when the laser increased from $1 million in 2018 to $2 million in 2019.

**H.   Platte River's Discovery of Gallagher's Failures**

69. In 2019, Platte River began actively researching and evaluating alternative insurance advisory and consulting firms.

70. Platte River solicited and received benefits analysis proposals from and conducted interviews with competing insurance advisory and consulting firms.

71. Through that process, in late April and May of 2019, Platte River learned for the first time that Platte River's stop loss insurance contracts did not include provisions for, without limitation, (i) no new laser at renewal, (ii) renewal rate cap, (iii) laser lock and (iv) timely aggregate stop loss coverage that capable insurance advisory and consulting firms would commonly discuss and procure each of these kinds of provisions (which were customary and readily available) with clients such as Platte River.

72. Late April and May of 2019 was the first time Platte River was aware that Gallagher could have procured better health insurance policies for it in the Pre-2017 Time, before the

10

Employee's child was born, and could have procured better renewal policies for it in 2017 and 2018, even after the Employee's child was born.

73. Based on Gallagher's warranty and representation regarding their experience and expertise in procuring appropriate health insurance policies specific to Platte River's needs, Platte River was shocked and dismayed when it learned that alternate policies that would have saved them significant costs were available in the marketplace.

## FIRST CLAIM FOR RELIEF
**(Breach of the Consulting Agreement, against Gallagher)**

74. Platte River hereby incorporates the allegations of paragraphs 1 through 73 of the Complaint as if fully repeated here.

75. The Consulting Agreement is a valid, binding, and enforceable agreement between Platte River and Gallagher.

76. Under the Consulting Agreement, Gallagher agreed to "assist Platte River Power Authority in developing strategies to provide comprehensive employee benefits at reasonable costs," which included "continual review of the organizational needs and objectives for the benefit plan design, assisting in plan management, plan budgeting, plan implementation, research and technical services, renewals and marketing, and assistance with plan compliance." Consulting Agreement, Exhibit A, Scope of Services, Section 5.

77. Gallagher also agreed to "[a]dvise on current plan design and recommend plan changes appropriate to Platte River Power Authority. Provide general guidance on trends in benefits and eligibility requirements regionally and nationally. Recommend plan changes based on these trends. Advise and consult on methods for improving cost containment and claims administration. Where applicable, provide cost analysis of possible impact on plan." Consulting Agreement, Exhibit A, Scope of Services, Section 5.1.

78. Gallagher also agreed to "[a]ssist in developing long-term benefit objectives and goals. Assist in the modification and pricing of any current, or newly considered, benefit programs. Work collaboratively to revise … the plan documents, including amendments and restatements…. Advise and consult on trends in benefit plans that are offered locally and nationally, including information on plans that are not currently offered.… Assist with the management of problem claims or appeals. Render opinions and/or guidance on such claims and/or appeals. Review unusual claims situations, such as appeals or subrogation which require special handling." Consulting Agreement, Exhibit A, Scope of Services, Section 5.2.

79. Gallagher also agreed to "[c]onduct an annual review and negotiation of renewal rates for long term disability, life insurance, employee assistance, stop loss insurance, and other plans. Advise when competitive quotes should be solicited from other carriers." Consulting Agreement, Exhibit A, Scope of Services, Section 5.3.

11

80. Platte River performed all conditions precedent to its rights to enforce the terms of the Consulting Agreement.

81. Gallagher breached the Consulting Agreement, including without limitation, by failing to adequately protect Platte River from the Employee's large individual claim; failing to advise Platte River about the possibility of lasers, the pros and cons of lasers, alternatives to lasers, or other available products that would mitigate significant loss resulting from a large claim; failing to advise Platte River regarding the pros and cons of self-insuring its health insurance plan, including the possibility and effects of a large, multi-year claim on a company that is self-insured; failing to advocate for and negotiate ways to mitigate Platte River's financial risk Platte River in the insurance marketplace; and failing to provide alternative policies to Platte River that would have protected Platte River against the large claim and resulting lasers, including failing to provide policies with provisions such as for (i) no new laser at renewal, (ii) renewal rate cap, (iii) laser lock, and (iv) timely aggregate stop loss coverage, which were available and customary for firms providing services similar to those Gallagher provided to clients such as Platte River.

82. Gallagher's breach of the Consulting Agreement caused harm to Platte River in the form of, among other things, financial loss due to the imposition of the 2018 Laser of $1 million and the 2019 laser of $2 million.

83. As a result of Gallagher's breach of the Consulting Agreement, Platte River is entitled to compensation for damages it has suffered in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
**(Negligence – Breach of Duty to Advise and Warn, against Gallagher, Brownlee, Adkins, and Ramirez)**

84. Platte River hereby incorporates the allegations of paragraphs 1 through 83 of the Complaint as if fully repeated here.

85. Defendants assumed additional responsibilities with respect to Platte River beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills such that "entrustment" and a "special relationship" existed between Gallagher, Brownlee, and Ramirez and Platte River.

86. Specifically, Defendants exercised broad discretion in serving Platte River's needs, including by agreeing to continual review of the organizational needs and objectives for the benefit plan design, assisting in plan management, plan budgeting, plan implementation, research and technical services, renewals and marketing, and assistance with plan compliance.

87. Defendants also counseled Platte River regarding procuring specialized insurance coverage such as stop loss plans.

88. Defendants held themselves out as highly-skilled insurance experts, and Platte River relied on them as such.

12

89. Defendants and Platte River had a long-standing relationship that began in 2013 and continued into 2019.

90. Consistent with the special relationship that existed between Gallagher and Platte River, Platte River paid Gallagher for its expert advice and services in the amount of $52,000 in 2013; $52,000 in 2014; $52,000 in 2015; $57,000 in 2016; $58,800 in 2017; $60,500 in 2018; and $62,300 in 2019.

91. Platte River relied upon Defendants' research, advice, and guidance regarding procuring the 2017 Stop Loss Plan, which, to Platte River's detriment, did not contain provisions that would have protected it against the large individual claim.

92. Based on the special relationship between Platte River and Defendants, Defendants owed a duty to advise and warn Platte River regarding the stop loss insurance policies they procured for Platte River, including the current and prospective financial impact of any modification to policy terms and the potential for a laser on a high-cost, long-term claim.

93. Defendants breached their duty to advise and warn Platte River by, among other things, failing to advise Platte River about the possibility of lasers, the pros and cons of lasers, alternatives to lasers, or other available products that would mitigate significant loss resulting from a large claim; failing to advise Platte River regarding the pros and cons of self-insuring its health insurance plan, including the possibility and effects of a large, multi-year claim on a company that is self-insured; and failing to advise Platte River regarding alternative policies that would have protected Platte River against the large claim and resulting lasers, such as provisions for (i) no new laser at renewal, (ii) renewal rate cap, (iii) laser lock, and (iv) timely aggregate stop loss coverage.

94. Platte River was financially injured by the failure to have adequate stop loss insurance including, among other things, by the 2018 Laser of $1 million and the 2019 Laser of $2 million which Platte River was forced to accept.

95. Defendants' breach of their duty to advise and warn caused Platte River's financial loss.

96. As a result of Defendants' breach of their duty, Platte River is entitled to compensation for damages it has suffered in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Negligence – Breach of Duty to Procure Adequate Insurance Policy, against Gallagher, Brownlee, Adkins, and Ramirez)**

97. Platte River hereby incorporates the allegations of paragraphs 1 through 96 of the Complaint as if fully repeated here.

98. Gallagher is an insurance agency that agreed to procure stop loss insurance coverage for Platte River at a reasonable cost, including "continual review of the organizational

13

needs and objectives for the benefit plan design, . . . plan budgeting, . . . [and] renewals and marketing." Consulting Agreement, Exhibit A, Scope of Services, Section 5.

99. Brownlee, Adkins, and Ramirez are insurance agents employed by Gallagher who agreed to procure stop loss insurance coverage for Platte River that would adequately protect Platte River against risks and liabilities, including a large individual claim.

100. Defendants owed a legal duty of care to Platte River to procure the agreed-upon coverage or advise Platte River that they were unable to procure coverage.

101. Defendants breached their legal duty of care to Platte River by, among other things, failing to procure stop loss insurance coverage for Platte River that would adequately protect Platte River against risks and liability, including a large individual claim.

102. At the time when Defendants breached their legal duty of care to Platte River by failing to procure stop loss insurance coverage for Platte River that would adequately protect Platte River against risks and liability, including a large individual claim, adequate stop loss insurance was generally available in the insurance industry.

103. Platte River was financially injured by the failure to have adequate stop loss insurance including, among other things, by the 2018 Laser of $1 million and the 2019 Laser of $2 million which Platte River was forced to accept.

104. Defendants' breach caused Platte River's financial loss because, if Platte River had a stop loss policy with protections against a large individual claim before the Employee's child was born, it would not have been forced to accept the 2018 Laser of $1 million and the 2019 Laser of $2 million.

105. As a result of Defendants' breach of their duty, Platte River is entitled to compensation for damages it has suffered in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Platte River Power Authority prays for judgment in its favor and against Defendants Gallagher Benefit Power Authority, Lynn Brownlee, Shawn Adkins, and Lisa Ramirez on the claims asserted in this Complaint and Jury Demand for the following relief:

A. Monetary damages in an amount to be determined at trial;

B. Costs, expenses, including expert witness fees, and attorneys' fees; and

C. Any such other and further relief that the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff Platte River Power Authority demands a jury trial on all issues so triable.

Respectfully submitted this 9th day of July 2020.

                                                                KUTAK ROCK LLP

                                                               *s/ John H. Bernstein*
                                                               John H. Bernstein, #17358
                                                               Reid A. Page, #37722
                                                               Elizabeth J. Field, #52696
                                                               1801 California Street, Suite 3000
                                                               Denver, CO 80202
                                                               (303) 297-2400

                                                               *Attorneys for Plaintiff Platte River Power Authority*

<u>Plaintiff's Address</u>
Platte River Power Authority
2000 E Horsetooth Rd.
Fort Collins, Colorado 80525

15